COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-002-CR

 

 

ROGER
EUGENE FAIN A/K/A                                                 APPELLANT

ROGER EUGENE FAIN, JR.

 

                                                   V.

 

THE
STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 372ND
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








A jury convicted Appellant Roger Eugene Fain
a/k/a Roger Eugene Fain, Jr. of capital murder, and the trial court sentenced
him to imprisonment for life.  Appellant
brings four points on appeal, challenging the legal and factual sufficiency of
the evidence and evidentiary rulings and arguing jury charge error.  Because the trial court committed no
reversible error, we affirm the trial court=s
judgment.

                                  Sufficiency
of the Evidence

In his first point, Appellant challenges both the
legal and factual sufficiency of the evidence to support his conviction for
capital murder.  He argues that the
evidence is both legally and factually insufficient to show (1) that he killed
Linda Donahew, the deceased, (2) that her death was caused intentionally, and
(3) that her death occurred in the course of committing or attempting to commit
the offense of aggravated sexual assault. 
Although he raises his complaints of legal and factual sufficiency in a
single point, the Texas Court of Criminal Appeals instructs us that we should
address them separately.[2]

The jury heard the following evidence.  Bonnie Bishop shared a house with her sister,
Donahew.  On June 1, 1987, Bishop left
work and arrived home at approximately 8:00 p.m.  She entered the house to find her sister=s nude
and blood-covered body lying on the floor in a bedroom closet.








The autopsy revealed that Donahew had died from
manual strangulation and that a secondary cause of death was a stab wound to
her neck.  The postmortem examination
also revealed several hairs found clinched in her hands, DNA artifacts in her
mouth, and three foreign pubic hairs in the genital area.

Approximately fourteen years later, in August
2001, a DNA sample was taken from Appellant, who was incarcerated for an
unrelated crime.  The sample was entered
into the Combined DNA Index System (CODIS) of the Texas Department of Public
Safety (DPS).  Four years later, in
October 2005, the cold case of Donahew=s murder
was reopened, and the DNA samples acquired during the examination of her body
were uploaded into CODIS and were found to match the DNA profile of Appellant.

There was no direct evidence of Appellant=s
involvement in Donahew=s murder.  At trial, the State relied on the DNA
evidence, testimony from a witness who saw a truck similar to that owned by
Appellant at the time of the offense parked in front of Donahew=s house
at the time of the offense, the testimony of an inmate, Danny Smith, who
claimed that Appellant had confessed to him in jail, testimony that Donahew had
previously been seen in the company of Appellant, and testimony that on the day
of her death she had said that she was worried about meeting someone who wanted
to look at a truck she was selling.








Dr. Nizam Peerwani, the medical examiner who
performed the autopsy and forensic examination of Donahew=s body,
testified that he took oral swabs from her mouth and that they contained DNA
material.  He testified that he was
unable to determine exactly when the DNA had been deposited in her mouth.  Kelly Solis testified that she was a DNA
analyst for the DPS CODIS lab in Austin, Texas. 
She testified that the DNA samples from the oral swabs taken by Dr.
Peerwani matched Appellant=s DNA
profile.

Constance Patton testified that she was a senior
forensic biologist and DNA technical leader for the medical examiner=s office
crime laboratory in Fort Worth.  She
testified that she had examined the samples from the oral swabs taken by Dr.
Peerwani and that the results of her examination showed that the samples
contained DNA material consistent with the DNA of Donahew and a mixture containing
one DNA sample consistent with that of Appellant and a sample of male DNA
foreign to both Donahew and Appellant. 
Patton testified that it could not be determined whether Appellant=s DNA
had been contributed before or after the other male DNA or how long it had been
present.  She also testified that she had
tested a portion of a towel taken from Donahew=s
house.  The towel tested presumptively
for blood and also for a mixture of DNA from Donahew.  She testified that a sample of male DNA from
Ronald Nix, a boyfriend of Donahew, could not be excluded from matching the
sample on the towel.  Patton also found a
sperm stain on the comforter from Donahew=s bed,
the DNA profile of which also matched Nix=s
sample.








Dr. Peerwani had found several hairs clutched in
Donahew=s hand
during the postmortem examination.  One
of the hairs was identified as dog hair. 
Other hairs were consistent with either the hair of Donahew or that of
her sister, Bishop.  One hair, however,
was not matched to Donahew, Bishop, or Appellant.

Susan Kenney testified that in 1987 she had been
working as a serologist in the Fort Worth Police Department Crime Lab.  She examined the evidence taken by Dr.
Peerwani as part of the examination of Donahew=s
body.  She testified that part of the
protocol of the examination was to comb the pubic hair area of Donahew.  In this case, the combing resulted in finding
three hairs that were not similar to those of Donahew. 

Detective Jim Ford testified that he had
requested DNA testing of the unknown pubic hair found on Donahew=s
body.  The test showed that Nix could not
be eliminated as a contributor of the hair.








Luke Kortegast, who testified by videotaped
deposition because he was on active duty in the military and scheduled to be
deployed overseas, testified that at the time of the offense, when he was
seventeen years old, he lived with his parents next door to Donahew, whom he
described as attractive.  He often saw a
white pickup truck parked at Donahew=s house
from the winter of 1986 through the early spring of 1987.  He described the truck as a mid-to-late 1970s
white pickup truck with large tires and a raised suspension.  He thought that it was a four-wheel drive
truck and in Apretty good shape.@  He testified that on occasion the truck had
been at the house overnight.  He did not
remember the trucks having a toolbox or a PVC pipe attached to its bed.

He described the driver as a white male,
approximately six feet tall and weighing between 175 and 200 pounds, with long
dark brown hair and a beard that ranged from a few days= stubble
to a full beard.  Kortegast testified
that the man usually wore a baseball cap and aviator-type sunglasses.

At some point in the spring, Kortegast stopped
seeing the truck at Donahew=s house,
but he testified that he did see it parked in the driveway one more time on the
day of Donahew=s murder.  He testified that the truck was in the
driveway at approximately 10:30 a.m. the day of her death.  He was unable to identify Appellant as the
driver of the truck, either at trial or from a photo spread.  Kortegast also testified that Donahew had
frequent visitors in addition to the bearded man.








Ernest Fain, Appellant=s
brother, testified that in 1987, Appellant drove a mid-1970s white Ford pickup
truck and that the truck had a black tool box and PVC piping attached to its
bed.  He described it as a standard
truck, not a raised four-wheel-drive vehicle. 
He also testified that he had seen Appellant approximately a dozen times
during 1986 and 1987 and that he had never known Appellant to have a
beard.  He also testified that the pickup
was Avery
beat up.@

Sheila Nelson testified that she lived next door
to Donahew in 1987.  On the day of
Donahew=s
murder, Nelson and her husband left the house at approximately 5:15 p.m. to
take a walk.  They noticed a white Ford
pickup truck parked on the street Anot in
front of my house and not in front of 
Linda=s but kind of in between the
two.@  She testified that it was an older model
truck with a tool box.  The truck was
still there when she returned from her walk about fifteen to twenty minutes
later.  She and her husband went out to
eat, and when they returned at about 8:30 p.m., the pickup was gone.  Nelson testified that Donahew had had a lot
of friends and quite a bit of company.

Bishop, Donahew=s
sister, testified that in November 2005 she had been shown a photo spread
containing Appellant=s photograph.  After looking at it for approximately twenty
minutes, she had told Detective Ford that she did not recognize anyone in
it.  After the photo array was shown to
her other sister, however, Bishop asked to see it again, and she then told Ford
that it looked like someone who had come up to Donahew in a restaurant and bar
called John B=s.  Bishop also testified that Donahew had broken
up with Nix some time before her death.








Donald Thweatt testified that in 1987 he owned
two horses, which he stabled at Braddock=s
Stables in Arlington.  Around June 1,
1987, he saw Donahew, who also kept horses there, at the stables.  She was not driving her usual vehicle but was
with a male in a 1970s white Ford pickup. 
He described the man as being about six feet tall and weighing around
180 pounds with shoulder-length hair and glasses.  On cross examination, Thweatt said that
Donahew and the man were unloading clear plastic bags of cedar shavings.  He also described the man as having an
untrimmed and unkempt beard.  Thweatt
testified that he could not remember the exact date, but that it was Asometime
in the late spring of 1987.@

Michael Higham testified that in the late spring
and summer of 1987, he was the detail shop manager of Pleasant Ridge Car Wash
in Arlington.  In the late spring or
early summer of 1987, Donahew took her car in for detailing.  When he had finished with the car, he went to
the horse stables to pick her up and take her back to her car.  She was with a man whom he identified as
Appellant.  Higham drove both the man and
Donahew back to pick up her car.








Arlington police officer William Zimmerman testified
that in August 1987, he had interviewed Michael Higham and that Higham had told
him that on the day he went to pick up Donahew at the stables, she was not
there when he arrived.  Higham had talked
to Ms. Braddock for a few minutes until Donahew arrived with a white male who
was driving a pale blue 1973 or 1974 pickup truck with wide spoked wheels.

Danny Smith, a sixty-three-year-old inmate who at
the time of trial was serving forty-five years=
confinement for involuntary manslaughter, enhanced to a habitual offense,
testified that he knew Appellant from having been in prison with him.  In 2005, while they were housed in the same
cell block of the Eastham Unit, Appellant told him that Arlington detectives
had visited him and had taken mouth swabs for DNA purposes.  After the visit, Appellant started Aacting
in an excited type of manner.@  Appellant told Smith that he had been having
sex with Donahew and had unintentionally strangled her during sex.  Smith claimed that Appellant told him that
the strangulation was part of the sex act.








Smith admitted that he was worried about the
possibility of dying in prison and that he had lost various appeals in his
case, up to and including his appeals in federal court and the United States
Supreme Court.  He also admitted that he
had made contact with the Tarrant County District Attorney=s office
regarding testifying against Appellant, calling himself a Acrucial
State=s
witness@ and
offering his testimony in exchange for benefits to him, including help with his
sentence.  He testified that he had
wanted a guarantee in writing of help Ain this
and possibly other offenses currently unsolved.@  He also admitted to having offered himself as
a State=s
witness in other cases.  In exchange, he
had asked to be removed from his current prison unit and placed in a unit with
better medical facilities.  He also
admitted that he had, in fact, been moved to a geriatric medical facility in
the Terrell Unit.

Smith testified that when he was interviewed by
Appellant=s trial counsel, he had told
them that he did not know why he had been brought to Tarrant County and that he
did not have any information that would help the State regarding Appellant=s
alleged killing of Donahew.  Smith also
denied knowing that one of Appellant=s
attorneys was, in fact, an attorney. 
Later, however, Smith admitted that he had previously written to the
same attorney requesting help in his case. 
Smith testified that Appellant had shared news articles from newspapers
and from the internet about the Donahew murder case.








Ronald Nix testified that he had dated Donahew
from February 1987 until her death.  In
May 1987, he and Donahew had taken a vacation together to Mexico.  A picture taken at the time of the trip
showed that in May 1987, Nix had dark, curly hair and wore a full beard.  He also testified that he had seen Donahew on
the Friday preceding her death.  He
testified that shortly before her death, he had been at a club with Donahew and
had seen her talking with a man whom Nix identified as Appellant.  Nix testified that Donahew had given
Appellant her phone number.  Nix also
admitted that he had been at Braddock Stables with Donahew in May 1987.

To recap, Danny Smith testified that Appellant
had admitted strangling Donahew, albeit during consensual sexual activity.  The medical examiner=s
evidence showed that stabbing was a secondary cause of death.  The jury was free to believe or disbelieve
Appellant=s description of the sexual
activity as consensual, and the fact that Donahew was stabbed was some evidence
that the sexual activity was not consensual. 
Corroborating evidence includes the evidence that Appellant=s DNA
was found in Donahew=s mouth, Nix=s
testimony that he had seen Donahew talking to Appellant in a bar, and Nelson=s
testimony that a truck similar to Appellant=s had
been parked on the street near Donahew=s house
after 5:00 p.m. on the day of her death. 
This evidence tends to connect Appellant to Donahew=s
murder.  Applying the appropriate
standard of review and viewing the evidence in the light most favorable to the
prosecution,[3]
we hold that a rational trier of fact could have found the essential elements
of capital murder in the course of committing aggravated sexual assault beyond
a reasonable doubt.








In determining the factual sufficiency of the evidence,
we recognize that most of the evidence is equivocal.  Appellant=s DNA
was found in Donahew=s mouth, but unidentified DNA
was also present in her mouth, and Nix=s DNA
was found in a semen stain on the bed=s
comforter and on a towel.  There is no
way to know when the DNA samples were deposited or the order in which they were
deposited.  Nix=s hair,
but not Appellant=s, was found in a combing of
Donahew=s pubic
hair.  Additionally, Nix=s
testimony that he was dating Donahew at the time of her death was disputed by
her sister=s testimony that Donahew had
broken up with Nix.  A photograph of Nix
from May 1987 showed that he had a beard, and there was testimony that Appellant
had never worn a beard.  A neighbor saw a
man with a beard visiting Donahew=s house
regularly and testified that the man drove a white pickup that was in good
shape, unlike the testimony regarding Appellant=s
pickup.  The neighbor testified that
there was a period of time when the man did not come to Donahew=s house
but that the pickup was in the driveway around 10:30 the morning she was killed.








Although there was testimony that Donahew had
been with a man at Braddock Stables in late spring or early summer, Nix
admitted that he had been at the stables with her in May 1987.  Officer Zimmerman testified that Michael
Higham had told him that Donahew had arrived in a pickup with a man.  Higham testified that he saw Donahew and a
man unloading clear plastic bags of cedar shavings.  The witnesses could have been testifying
about two different men or two different occurrences with the same man.








Smith=s
testimony was corroborated by the evidence of the presence of a pickup similar
to the description of Appellant=s pickup
outside Donahew=s house on the evening she was
killed and the presence of Appellant=s DNA in
her mouth.  The jury apparently believed
that Appellant had confessed to Smith but did not believe that Appellant had
engaged in consensual sexual activity with consensual autoerotic strangulation.[4]  The fact that Donahew was also fatally
stabbed is evidence that undermines Appellant=s claim
of consent.  AThe
jury, as the exclusive judge of the credibility of the witnesses and the weight
to be given their testimony, may accept all, part or none of the testimony of
any one witness in determining the facts proved.@[5]  Because stabbing was a secondary cause of
death, and Donahew was alive when she was stabbed, according to the medical
examiner=s
testimony, the strangulation and stabbing occurred in close temporal
proximity.  It was reasonable for the
jury to believe that Appellant had told Smith that he had strangled Donahew and
to believe that Appellant was truthful about the strangulation, but also
reasonable for the jury to disbelieve Appellant=s claim
that the sexual activity and the strangulation were consensual.  And it was reasonable for the jury to
conclude, based on the medical examiner=s testimony,
that Appellant had also stabbed Donahew. 
Applying the appropriate standard of review,[6]
we therefore hold that the evidence is factually sufficient to support the jury=s
verdict.  We overrule Appellant=s first
point.

                                     Seizure
of DNA Sample

In his second point, Appellant argues that the
trial court committed reversible error by denying his challenge to the taking
of a DNA sample from his body.








In August 2001, a DNA sample was taken by
swabbing Appellant=s mouth.  It was taken in compliance with a general
provision requiring routine collection of DNA samples from individuals who had
been convicted of certain offenses.[7]  When the sample was entered into DPS=s CODIS,
it became available for comparison with the DNA evidence acquired when Donahew=s body
was examined.  When those samples taken
from Donahew were uploaded into CODIS, they showed a match with Appellant=s DNA
profile.

The trial court denied Appellant=s motion
to suppress the DNA evidence.  Although
the DNA sample at trial was taken pursuant to a warrant, dated December 5,
2005, the warrant was obtained based on the CODIS match, which had been based
on the initial 2001 DNA sample obtained from Appellant without a warrant but
pursuant to the government code provision. 
The Texas Court of Criminal Appeals has addressed this issue and has
decided it contrary to Appellant=s
argument: 

Although the taking of a blood sample for DNA
analysis purposes is clearly a search, the Fourth Amendment does not proscribe
all searches, only those that are unreasonable. 
The United States Supreme Court has yet to address the validity of state
and federal DNA collection statutes under the Fourth Amendment, but state and
federal courts that have addressed the issue of a warrantless search for DNA
databank samples pursuant to statute are almost unanimous in holding that these
statutes do not violate the Fourth Amendment. 









The courts deciding this issue have split in their rationale.  Some have stated that DNA collection statutes
permit a warrantless, suspicionless search under the Supreme Court=s Aspecial needs@ test.  Most federal and state courts, however, have
upheld the DNA databank statutes under the Atotality of circumstances@ test.  This trend increased after the Supreme Court=s decision in Samson
v. California, which used the Atotality of the circumstances@ test to uphold
suspicionless searches of felons on parole, as long as the searches are not
arbitrary, capricious, or harassing. 
Even before Samson, numerous courts had applied the Atotality of the circumstances@ test and concluded that
the governmental interest served by collecting DNA outweighed the minimal
intrusion upon a probationer=s or parolee=s privacy. 
We agree with those jurisdictions that have held that warrantless DNA
collection and databank systems pass Fourth Amendment scrutiny under the Atotality of the
circumstances.@[8]

 

Following the mandatory precedent of the Texas Court of Criminal
Appeals, we overrule Appellant=s second
point.

                                          Mistake
of Fact

In his third point, Appellant argues that the
trial court reversibly erred by failing to include a mistake of fact jury
instruction in the jury charge.  Section
8.02 of the penal code provides that it is a defense to prosecution that Athe
actor through mistake formed a reasonable belief about a matter of fact if his
mistaken belief negated the kind of culpability required for commission of the
offense.@[9]  A defendant is entitled to an instruction on
mistake of fact if the issue is raised by the evidence.[10]  If the evidence when viewed in the light
favorable to the defendant does not establish a mistake of fact defense, the
instruction is not required.[11]









The indictment charges that Appellant
intentionally caused the death of Linda Donahew by strangling her with his hand
or hands, or with an object unknown to the grand jury, by stabbing her with a
knife, or by any combination of strangling and stabbing her with a knife, and
that Appellant was in the course of committing or attempting to commit the
offense of aggravated sexual assault when he caused her death.  Smith testified that Appellant told him that
he had been having sex with Donahew and had unintentionally strangled her
during sex and that the strangulation was part of the sex act.  The trial court refused to instruct the jury
regarding a mistake of fact on Appellant=s part
regarding the degree of the compression of Donahew=s
neck.  To the extent that the manual
strangulation was the cause of death, Smith=s
testimony raises the issue of mistake of fact. 
Accordingly, the trial court should have given the mistake of fact
instruction and erred by not doing so. 








Error in the charge, if, as here, properly
preserved in the trial court, requires reversal if the error was Acalculated
to injure the rights of [the] defendant,@ which
means no more than that there must be some harm to the accused from the
error.[12]  In other words, a properly preserved error
will require reversal as long as the error is not harmless.[13]  Whether Appellant suffered any harm Amust be
assayed in light of the entire jury charge, the state of the evidence,
including the contested issues and weight of probative evidence, the argument
of counsel, and any other relevant information revealed by the record of the
trial as a whole.@[14]

The jury was instructed that a person commits
aggravated sexual assault if he Aintentionally
or knowingly causes the penetration of the mouth of another person, who is not
the spouse of the actor, by the sexual organ of the actor, without that person=s
consent, and if the person causes serious bodily injury or attempts to cause
the death of the victim.@ 
The trial court also instructed the jury that serious bodily injury
means Abodily
injury that creates a substantial risk of death or that causes death, serious
permanent disfigurement, or protracted loss or impairment of the function of
any bodily member or organ.@








The jury charge, then, implicitly instructed the
jury that if Appellant caused Donahew=s death
in the course of committing sexual assault, he had committed aggravated sexual
assault, and the jury charge explicitly instructed the jury that if Appellant
caused her death during the commission of aggravated sexual assault, he had
committed capital murder.  That is, the
jury was implicitly instructed that the act that converted sexual assault into
aggravated sexual assault could be the same act that converted this offense
into capital murder.








Although the capital murder statute provides that
a person who causes the death of another individual in the course of committing
kidnapping or robbery commits the offense of capital murder, this statute does
not allow for the conviction of a person for capital murder if the person
committed simple sexual assault rather than aggravated sexual assault.[15]  That is, a person may commit simple
kidnapping or robbery, without an aggravating element, and if the person causes
death during the commission of one of those offenses, the person commits
capital murder.[16]  But in regard to sexual assault, a person is
guilty of capital murder only if the person causes the death in the course of
committing aggravated, not simple, sexual assault.[17]  Neither the State nor Appellant suggests that
the aggravated sexual assault was proved by evidence of the attempt to cause
the death, which in this case was successful. 
Can the attempt to cause the death be carved out as a separate
aggravating factor from the successful act of causing the death?  Appellant did not raise this issue as part of
his sufficiency claim; we bring it up only in addressing harm.

The medical evidence establishes that Donahew was
both strangled and stabbed.  There is no
evidence of a threat that would elevate the sexual assault to an aggravated
sexual assault.[18]  Although both means of causing the death were
submitted to the jury, there is no evidence that the stabbing was accidental or
the result of a mistake of fact. 
Additionally, the evidence shows that Donahew was stabbed while she was
still alive.  It was the stab wound, not
the strangulation, that the medical examiner testified was delivered to Areally
make sure [she was] going to die.@  Although the medical examiner described the
cause of death as Amanual strangulation and the
second cause of death was a stab wound to the left neck,@ the
stab wound was delivered to a living person.








Both the indictment and the jury charge allowed
the jury to convict Appellant of capital murder if the jury found that
Appellant had caused Donahew=s death
by stabbing her with a knife in the course of committing aggravated sexual
assault.  AWhen a
general verdict is returned and the evidence is sufficient to support a finding
of guilt under any of the paragraph allegations submitted, the verdict will be
upheld.@[19]

The record before this court would allow the jury
to view the strangling as the threat of death or serious bodily injury in the
course of sexual assault to raise sexual assault to an aggravated offense.[20]  The jury therefore could have found that the
stab wound caused the death in the course of Appellant=s
committing aggravated sexual assault.

The State was obligated to prove that Appellant
intentionally caused Donahew=s death.  Failure to include the requested instruction
on mistake of fact would at first glance seem to necessitate a determination
that Appellant suffered some harm as a result of that failure.  But here, Donahew was not only strangled; she
was also stabbed, as the medical examiner phrased it, to make sure that she was
really dead.  It was therefore
unnecessary for the jury to find that Appellant intended to strangle her to
death in order for the jury to find that he intentionally caused her death by
stabbing her in the neck.  Mistake of
fact went only to the strangling, not to the stabbing.








Because of the presence of the stab wound, we
conclude that Appellant did not suffer any harm from the trial court=s
refusal to give the mistake of fact instruction regarding the degree of
compression of Donahew=s neck.  Accordingly, we overrule Appellant=s third
point.

                                     Rule
803(3) Statement

In his fourth point, Appellant argues that the
trial court reversibly erred by admitting a statement by Donahew that she was
going to show her pickup to a man who might be interested in purchasing
it.  Appellant argues that he was
entitled to confront and cross examine the witness about the statement and that
its admission constituted inadmissible hearsay and a denial of his rights under
the Confrontation Clause of the Sixth Amendment.

Linda Reed testified that Donahew was a close
friend and had come to her house for a visit around 11:00 a.m. on the day she
died.  Donahew left around 3:00 p.m. that
afternoon, and as she left, she told Reed that she was nervous because later
she was going to show her pickup truck to a man she had met at the stables and
that he might buy it from her.  Reed
testified that Donahew had a bad feeling about the meeting.








The State argues that the statement was not
testimonial and therefore not subject to a Crawford analysis.[21]  We agree. 
The Sixth Amendment Confrontation Clause forbids the admission of
testimonial statements of a witness who does not appear at trial unless that
person was unable to testify and the defendant had a prior opportunity for
cross examination.[22]  The Supreme Court suggests that testimonial
statements are those Amade under circumstances which
would lead an objective witness reasonably to believe that the statement would
be available for use at a later trial.@[23]  The State argues that such casual remarks
made to friends are generally not testimonial. 
Under the limited facts of this case, we agree that Donahew=s
statement to Reed was not testimonial but, rather, a casual remark expressing
her intent to go show her truck.  The
statement about being nervous is an indication of her state of mind.  There is no indication that Donahew made her
remark to Reed under circumstances that would have led an objective witness to
believe that the statement would be available for use at a trial later.  Because the statement was not testimonial, it
does not violate the Confrontation Clause.








Regarding Appellant=s
contention that the statement is inadmissible hearsay, the State argues that
under the Hillmon doctrine,[24]
a remark is admissible as a hearsay exception under rule 803(3) if it
constitutes a statement of present state of mind offered to prove subsequent
conduct in accordance with the state of mind. 
We disagree with the State=s
analysis but not its ultimate conclusion that the statement was
admissible.  Donahew=s
statement was not admissible to show that she did indeed go to show her
truck.  It was not admissible for the
truth of the matter asserted but rather to show her intent, her state of mind.[25]  We overrule Appellant=s fourth
point.

                                             Conclusion

Having overruled Appellant=s four
points, we affirm the trial court=s
judgment.

 

LEE
ANN DAUPHINOT

JUSTICE

 

PANEL:  LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: August 20,
2009











[1]See Tex. R. App. P. 47.4.





[2]Laster v. State, 275 S.W.3d 512, 519
(Tex. Crim. App. 2009).





[3]See Jackson v. Virginia, 443 U.S. 307, 319, 99
S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778 (Tex.
Crim. App. 2007).





[4]See Johnson v. State, 23 S.W.3d 1, 8, 9 (Tex.
Crim. App. 2000).





[5]Johnson v. State, 503 S.W.2d 788, 793
(Tex. Crim. App. 1974).





[6]See Neal v. State, 256 S.W.3d 264, 275 (Tex.
Crim. App. 2008), cert. denied, 129 S. Ct. 1037 (2009); Lancon v.
State, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson v. State,
204 S.W.3d 404, 414B15, 417 (Tex. Crim. App.
2006); Johnson, 23 S.W.3d at 8, 9, 12.





[7]See Act effective Sept. 1,
1999, 76th Leg., R.S., ch. 1368, 1999 Tex. Gen. Laws 4626, 4626B27 (current version at
Tex. Gov=t Code Ann. ' 411.148 (Vernon
Supp. 2008)).





[8]Segundo v. State, 270 S.W.3d 79, 97B98 (Tex. Crim. App. 2008)
(citations omitted).





[9]Tex. Penal Code Ann. ' 8.02(a) (Vernon
2003).





[10]Beggs v. State, 597 S.W.2d 375, 380
(Tex. Crim. App. 1980).





[11]Granger v. State, 3 S.W.3d 36, 38 (Tex.
Crim. App. 1999).





[12]Tex. Code Crim. Proc.
Ann. art. 36.19 (Vernon 2006); Abdnor v. State, 871 S.W.2d 726, 731B32 (Tex. Crim. App.
1994); Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op.
on reh=g); see also Minor v.
State, 91 S.W.3d 824, 827B29 (Tex. App.CFort Worth 2002, pet. ref=d) (applying analysis).





[13]Almanza, 686 S.W.2d at 171.





[14]Id.; see also Ovalle v.
State, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).





[15]Tex. Penal Code Ann. ' 19.03(a)(2) (Vernon
Supp. 2008).





[16]Id.





[17]Id.





[18]See id. ' 22.021(a)(1),
(2)(A)(ii)B(iii).





[19]McDuff v. State, 939 S.W.2d 607, 614
(Tex. Crim. App.), cert. denied, 
522 U.S. 844 (1997).





[20]Tex. Penal Code Ann. ' 22.021(a)(1),
(2)(A).





[21]Crawford v. Washington, 541 U.S. 36, 124 S. Ct.
1354 (2004).





[22]Vinson v. State, 252 S.W.3d 336, 338
(Tex. Crim. App. 2008) (citing Crawford, 541 U.S. at 53B54, 124 S. Ct. at 1365).





[23]See Crawford, 541
U.S. at 51B52, 124 S. Ct. at 1364.





[24]Mut. Life Ins. Co. of
N.Y. v. Hillmon, 145 U.S. 285, 12 S. Ct. 909 (1892).





[25]See Tex. R. Evid. 803(3).